# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 7, 2012 Session

## STATE OF TENNESSEE v. ANDRIANNE KISER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-06737     John Fowkles, Jr., Judge**

---

**No. W2011-01937-CCA-R3-CD  - Filed December 10, 2012**

---

A Shelby County Criminal Court Jury convicted the appellant, Andrianne Kiser, of two counts of attempted voluntary manslaughter, one count of employing a firearm during the commission of a dangerous felony, and one count of reckless endangerment.  After a sentencing hearing, the appellant received an effective sentence of sixteen years in confinement.  On appeal, the appellant contends that (1) the evidence is insufficient to support the convictions, (2) the trial court erred by allowing a State witness to testify about telephone calls she received before trial, and (3) his effective sentence is excessive.  Based upon the oral arguments, the record, and the parties' briefs, we conclude that the evidence is insufficient to support the appellant's reckless endangerment conviction.  Therefore, that conviction is reversed.  The appellant's remaining convictions and sentences are affirmed.  However, the case is remanded to the trial court for correction of the judgment for employing a firearm during the commission of a dangerous felony.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part, Reversed in Part, and the Case is Remanded**.

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, and ROGER A. PAGE, JJ., joined.

Joseph A. McClusky (on appeal) and Dianne Thackery (at trial), Memphis, Tennessee, for the appellant, Andrianne Kiser.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Neal Oldham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

In September 2010, the Shelby County Grand Jury indicted the appellant, Andrianne Kiser,[1] for two counts of attempted second degree murder as a result of his shooting Cedric Sawyer and David Secamond on April 2, 2010. The grand jury also indicted the appellant for one count of employing a firearm during the commission of a dangerous felony and one count of reckless endangerment for endangering the lives of Erica Bays and Ciera Williams during the incident.

At trial, Kevin Pilatt testified that in April 2010, he was working as a security officer at the Crystal Palace, a roller skating rink in Memphis. Pilatt explained that once a person entered the front doors of the building, a long hallway led to two ticket booths. The hallway and the ticket booths were separated from the skating rink area by a set of doors to the right of the ticket booths. On the night of April 2, 2010, a rap concert was scheduled to take place. However, the concert was canceled, and business at the skating rink was slow. About 9:00 p.m., Pilatt was about to go home when ten to twenty cars containing thirty to fifty people arrived in the parking lot. He said that at first, the people were "wrestling around" in the parking lot. Then they all went inside the building. Pilatt was walking behind the crowd and saw the crowd go into the skating rink area without stopping by the ticket booths to pay the admission fee. Pilatt's mother, the manager of the Crystal Palace, announced over the intercom that everyone needed to go to the ticket booths, but the crowd refused. Eventually, the security officers were able to get the crowd out of the skating rink area and back into the hallway. Pilatt said that everyone was "arguing and cussing back and forth"; that someone in the crowd assaulted a security officer; and that everyone ran down the hallway, out the front doors, and into the parking lot. By the time Pilatt got to the front doors, shots were being fired in the parking lot. He heard two sets of shots and heard three to four shots during each set. Cedric Sawyer, a security officer standing next to Pilatt, was shot in the chest. Pilatt later found a bullet hole in his shirt under his left arm.

David Secamond[2] testified that on the night of April 2, 2010, he was working as a security officer at the Crystal Palace. There was not enough business to justify security officers being at the skating rink, and Secamond was about to leave when sixty to eighty

---

[1]The appellant's first name appears as "Andrianne" and "Adrianne" throughout the appellate record. However, we have referred to his first name as it appears in the indictment.

[2]Although the witness's last name is spelled "Seccamond" in the trial transcript, we have spelled it as it appears in the indictment.

people arrived. He said that everyone went inside the Crystal Palace, that someone held open the doors to the skating rink area, and that the crowd went into the area without paying. Security officers ushered the crowd into the hallway and pushed the crowd toward the front of the building. Everyone started exiting the building through the front doors, and Secamond heard gunshots in the parking lot. He was shot in the hip. He did not see the shooter and spent three days in The Med.

Cedric Sawyer testified that on the night of April 2, 2010, a rap performance was supposed to start at the Crystal Palace at 7:00 or 8:00 p.m. The rap group did not show up, and regular customers were skating. Sawyer was sitting in the parking lot about 10:00 or 10:30 p.m. when twenty or thirty people arrived and entered the building. Three people went to the ticket booths and paid the admission fee. Sawyer said that one of them opened the doors to the skating rink area and that the crowd "started bum rushing" through the doors. Security officers stopped the crowd, and the crowd began arguing with the officers. Sawyer said that someone hit one of the security officers in the eye and that everyone "stormed out" of the skating rink area and ran down the hallway toward the front of the building. When Sawyer got to the front doors, he heard two gunshots. He was shot in the chest and spent two weeks in The Med. He said that he did not see the shooter but that he saw the appellant in the building on the night of the shootings. He said he had never seen the appellant before April 2, 2010.

Andre Boyd testified that on the night of April 2, 2010, he worked as a security officer at the Crystal Palace. Boyd arrived for work about 9:45 p.m. About thirty minutes later, the security officers were informed that the manager could not afford to pay them for the night. Boyd said that the manager bought them chicken dinners and that they "hung out . . . for a little while." Fifty to sixty people arrived, and the officers had to get the crowd out of the skating rink area. Boyd said that the crowd was "getting louder and cursing and wanted to fight" and that someone "threw a punch" at one of the officers. The security officers forced the crowd into the hallway outside the skating rink area, and the crowd went into the parking lot. Boyd was standing at the front doors when he heard five or six gunshots. His roommate, David Secamond, was shot. Boyd said that the crowd's altercation with the security officers was over "within a matter of minutes. As quick as it started . . . it ended."

On cross-examination, Boyd testified that all of the gunshots came from the same direction. He acknowledged that he testified at a previous hearing related to this case. He said he did not remember stating at the hearing that two people were shooting. However, he said it was possible he made that statement. He also acknowledged saying at the hearing that some of the shots came from a nine millimeter gun and that the other shots came from a "thirty-eight."

Ciera Williams testified that on April 2, 2010, she and her family drove to Memphis to shop and go to the Crystal Palace. Some of Williams's family members went inside the Crystal Palace to skate. Williams did not go inside; she left the property to get something to eat. She returned to the skating rink and was sitting outside in her car with her sister when six to ten cars arrived in the parking lot. Twenty-five or thirty people got out of the cars and went inside the Crystal Palace. Then all of the people came running outside. Williams said that she saw a male standing "right in front" of her car and that he was shooting toward the building. The shooter got into the driver's side of a red truck or SUV, the vehicle pulled away, and the shooter fired into the air. Williams said the red vehicle was to the right of her car and was "probably like two car places away." Williams said that when the crowd first arrived in the parking lot, she saw the shooter for about ten minutes, "play fighting around." The State asked Williams if she saw the shooter in the courtroom. Williams, referring to the appellant, stated, "Um, he kind of looks like him, because his ears point out, his ears stick up. . . . He just, because his ears point up, he favors – that's what I remembered with his hat on, the pointed ears sticking out." The State asked if the appellant was the shooter, and Williams stated, "I am not sure."

On cross-examination, Williams testified that she arrived at the Crystal Palace about 10:30 p.m. She acknowledged that she testified at a previous hearing and that she was asked during the hearing to identify the shooter.

On redirect examination, Williams acknowledged that she identified the appellant at the hearing as the shooter. The State asked Williams, "How are you feeling right now?" Williams answered, "Shaky," and the State requested a jury-out hearing. When Williams's redirect testimony resumed, she testified that was scared to testify against the appellant because she had received telephone calls from a male "telling me not to show up in Court." She said that she received the first call near the end of 2010, that the call was from a "9-0-1 number," and that the male said he was calling for "A. D." The male knew the name of Williams's sister and knew that Williams lived in Clarksdale, Mississippi. Williams said that she received another telephone call "this past weekend" and that the call was again from a "9-0-1 number." The male said that his name was "Shaun" and that he was calling for "A. D." Williams said she was scared because the male knew her name, her telephone number, and the town in which she lived. She said he asked if he was speaking to Ciera, "the one who testified about the shooting." Williams lied to him by telling him that she was not Ciera and hung up. Williams identified the appellant in court as the shooter. She acknowledged that she had trouble identifying the appellant as the shooter on direct examination because she was afraid.

On recross-examination, Williams testified that on the night of April 2, 2010, the shooter was wearing a black "skull cap" and was about five feet, four inches tall. She said

-4-

that after the appellant shot toward the building, an SUV pulled up, and the appellant "jumped" into the driver's side. She acknowledged testifying at the appellant's preliminary hearing that she only saw the side of the shooter's face. She also acknowledged that she told the police the gun was silver and was not a revolver.

Erica Bays, Ciera Williams's sister, testified that on the night of April 2, 2010, she and Williams were sitting in Williams's car while other family members were skating inside the Crystal Palace. At 10:30 p.m., about thirty teenagers arrived. Some of them were playing and wrestling in the parking lot. About fifteen minutes later, the teenagers went into the Crystal Palace. Bays saw everyone run outside. She said that the first person out of the building was standing in front of Williams's car and was "firing back at the skating rink." The shooter was standing six to eight feet away from Bays. He ran to a red truck that had pulled up about two parking spaces away from Williams's car and fired gunshots into the air. He got into the back of the truck on the passenger side, and the truck drove away. Bays identified the appellant at trial as the shooter and said he was one of the people she had seen wrestling earlier in the parking lot. She spoke with the police after the shooting, looked at a photograph array on April 6, 2010, and identified the appellant's photograph. Bays was asked to identify the shooter at the appellant's preliminary hearing, and she identified someone other than the appellant. At trial, she explained, "I didn't pick out the right person, because I was nervous and scared[.]"

On cross-examination, Bays acknowledged that she gave a statement to police in which she described the shooter as "a little boy." She also acknowledged that she told the police the shooter was fifteen to twenty feet away from her when he fired the first set of shots and that he said "bitch" every time he fired. She acknowledged that she told the police the shooter was wearing a black shirt and a hat and that she described the hat as "probably like a baseball hat." At the appellant's preliminary hearing, Bays testified that she was trying to hide during the shooting. At trial, she said she was "sliding [down] in the seat" but could still see the appellant.

Officer Jason Matthews of the Memphis Police Department (MPD) testified that he responded to the shootings and was the first officer on the scene. One victim was lying inside the front door with a gunshot wound to his lower back or buttocks. Officer Matthews went inside and saw another victim with a wound to the center of his chest. Two females were sitting in a car in the parking lot.

Officer John Byars of the MPD testified that he investigated the shootings and developed the appellant as a suspect. On April 6, 2010, he showed Erica Bays a photograph array. He said Bays identified the appellant "[i]mmediately."

Officer David Payment of the MPD testified that he collected crime scene evidence after the shootings and found eight spent shell casings. The first casing was 90 feet away from the west wall of the Crystal Palace; the second casing was 92 feet, 8 inches away; the third casing was 90 feet, 6 inches away; and the fourth casing was 93 feet, 8 inches away. The first four casings were nine millimeter Luger spent casings. The fifth casing was 141 feet, 10 inches away from the west wall of the Crystal Palace; the sixth casing was 181 feet, 6 inches away; the seventh casing was 180 feet away; and the eighth casing was 182 feet, 8 inches away. All of the casings in the second group were forty caliber Smith and Wesson spent casings. On cross-examination, Officer Payment acknowledged that he did not know how long the casings had been in the parking lot.

Twenty-four-year-old Dashaun "Shaun" Hobbs, the appellant's younger brother, was called as the State's last witness and acknowledged that he telephoned a witness in this case. He said that he telephoned the witness "about two weeks ago . . . or a week and a half or so[.]" He stated, "I just asked her was she coming, 'cause I didn't feel that he had committed the crime, or whatever." He said that the appellant asked him to telephone the witness and that he did not know he was not supposed to contact witnesses in the case.

Dr. Jeffrey Neuschatz testified for the appellant as an expert in eyewitness identification that he was an associate professor and the Chair of the Psychology Department at the University of Alabama in Huntsville. He said that he had reviewed police reports, witness statements, and the preliminary hearing testimony in this case and that he was testifying as a paid consultant for the defense. Dr. Neuschatz explained that when a person witnessed a complex event, the person did not remember the entire event. Instead, the person remembered fragments of the event and put the fragments together with other information. He said that the person could make inferences from events he or she had experienced that were similar to the event in question, that the person could collect information from "external sources," and that "they put all that together." He said that memory was "very fluent" and that a person's memory could change every time the person retold the story. A person could well-remember events the person had repeated or rehearsed, such as driving home, but events the person saw only one time were susceptible to "memory impairment." Witnessing a stressful event, such as a shooting, could impair a person's memory. He said that eyewitness identification accuracy also was much worse when the culprit was wearing a hat because the hat "cuts off some of the cues to the face." He said that seeing someone prior to the event could cause "unconscious transference," which occurred "when you mistakenly think someone who is at the scene was the person who committed the crime."

On cross-examination, Dr. Neuschatz acknowledged that he had not spoken to anyone involved with this case and that he was testifying based upon studies and hypotheses. He also acknowledged that seeing a person for ten to fifteen minutes prior to the stressful event

would help an eyewitness identify the person later.

On redirect examination, defense counsel showed Dr. Neuschatz a photograph of the crime scene. He described the scene as "dimly lit."

The jury convicted the appellant of two counts of attempted voluntary manslaughter, a Class D felony, as a lesser-included offense of attempted second degree murder; one count of employing a firearm during the commission of a dangerous felony, a Class C felony; and one count of reckless endangerment, a Class E felony. After a sentencing hearing, the trial court sentenced him to consecutive sentences of four years for each attempted voluntary manslaughter conviction, six years for the employing a firearm conviction, and two years for the reckless endangerment conviction for a total effective sentence of sixteen years in confinement.

## II.  Analysis

### A.  Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support the convictions. When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

### 1.  Eyewitnesses Unreliable

First, the appellant contends that the evidence is insufficient to support all of the convictions because Ciera Williams's and Erica Bays's identifications of him are unreliable. He notes that Williams initially was unable to identify him at trial as the shooter and that Bays identified someone else at his preliminary hearing as the shooter. The State argues that the evidence is sufficient. We agree with the State.

Regarding Williams's identification of the appellant, the State asked her on direct examination if the appellant was the shooter, and she answered, "I am not sure." On redirect examination, Williams explained that she had been afraid to identify the appellant because someone had contacted her and told her not to come to court. Deshaun Hobbs later admitted that he had contacted Williams at the appellant's request. Regarding Bays's identification of the appellant, Bays acknowledged at trial that she identified another person at the appellant's preliminary hearing as the shooter. However, Bays had identified the appellant from a photograph array just four days after the crimes, and Officer Byars testified that Bays selected the appellant's photograph "[i]mmediately." Bays also identified the appellant at trial as the shooter. The jury, as was its prerogative, obviously accredited the witnesses' testimony and resolved any discrepancies in favor of the State. We conclude that the evidence is sufficient to support the convictions.

## 2. Attempted Voluntary Manslaughter

Next, the appellant contends that the evidence is insufficient to support his attempted voluntary manslaughter convictions because the State failed to show that he acted under adequate provocation. He claims that, at most, he is guilty of reckless endangerment. In a related argument, he contends that if this court finds he is guilty of reckless endangerment, then his conviction for employing a firearm during the commission of a dangerous felony cannot stand because reckless endangerment is not listed as a "dangerous felony" pursuant to Tennessee Code Annotated section 39-17-1324(i)(1). The State argues that the evidence is sufficient to support the attempted voluntary manslaughter convictions. We agree with the State.

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Relevant to this case, a person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2).

Taken in the light most favorable to the State, the evidence shows that a crowd of

people forced its way into the skating rink area, that the manager told everyone to exit the area and go to the ticket booths, and that security officers forced the crowd into the hallway. The people in the crowd were angry with the officers and cursing them, and someone in the crowd assaulted an officer. Then everyone ran outside. The appellant, who was the first person out of the building, turned around and fired numerous gunshots toward the front doors where the security officers were standing, striking Sawyer and Secamond. The jury obviously concluded that the appellant's being forced out of the skating rink created adequate provocation to support convictions for attempted voluntary manslaughter, and we will not second-guess the jury's decision. Given that the evidence is sufficient to support the attempted voluntary manslaughter convictions, the appellant's argument regarding the conviction for employing a firearm is moot.

### 3. Reckless Endangerment

Finally, the appellant contends that the evidence is insufficient to support the felony reckless endangerment conviction because Williams and Bays were not in the "zone of danger." The State argues that the evidence is sufficient because the bullets could have ricocheted off the building and struck the victims. We agree with the appellant that the evidence is insufficient.

Felony reckless endangerment is defined as "[engaging] in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). "Reckless endangerment committed with a deadly weapon is a Class E felony." Tenn. Code Ann. § 39-13-103(b)(2). A firearm is a "deadly weapon." Tenn. Code Ann. § 39-11-106(a)(5)(A). In State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999), our supreme court explained that in order for the threat "to be 'imminent,' the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." Moreover, "the term 'zone of danger' may be employed to define that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area." Id.

Turning to the instant case, the State argued during the appellant's motion for judgment of acquittal and during closing arguments that the appellant's firing into the air in a crowded parking lot constituted reckless endangerment. On appeal, the State argues for the first time that the appellant is guilty of reckless endangerment because the bullets he fired toward the Crystal Palace could have ricocheted off the building and struck Williams and Bays. We are unpersuaded by either argument.

Taken in the light most favorable to the State, the evidence shows that the appellant ran out of the Crystal Palace, turned around, and fired four shots toward the building. He

was at least ninety feet away from the building and was standing in front of Williams's car when he fired the first set of shots. Williams and Bays were behind him and were not in the line of fire. Although the State now claims that the bullets could have ricocheted off the building and struck Williams and Bays, the State did not make that argument at trial and presented no evidence to support that theory. After the appellant fired the first set of shots, he ran to a red SUV that had stopped about two parking spaces away from Williams's car and fired four shots into the air. The State introduced photographs showing the locations of the second set of spent shell casings and Williams's car. However, the State did not present any evidence to show how far away the appellant was from the car when he fired the second set of shots; whether Williams and Bays were in the "zone of danger"; or whether the bullets could have injured the sisters, who were sitting in the car, upon the projectiles' descent. Therefore, we conclude that the evidence is insufficient to support the reckless endangerment conviction.

In sum, we conclude that the evidence is insufficient to support the appellant's reckless endangerment conviction and that the conviction must be reversed. The evidence is sufficient to support the appellant's convictions of attempted voluntary manslaughter and employing a firearm during the commission of a dangerous felony.

## B. Williams's Rebuttal Testimony

The appellant claims that the trial court erred by allowing Ciera Williams to testify about telephone calls she received before trial, telling her not to come to court. The appellant argues that the evidence was inadmissible under 404(b), Tennessee Rules of Evidence, and had little to no probative value. The State argues that the trial court properly admitted Williams's testimony. We agree with the State.

On direct examination, the State asked Williams if the appellant was the shooter, and Williams answered, "I am not sure." On redirect examination, she acknowledged that she identified the appellant as the shooter at a previous hearing. The State asked how she was feeling, and she described herself as "Shaky." The State requested a jury-out hearing. During the hearing, Williams said she was nervous and scared because "[ever] since I testified the first time I been getting phone calls." She said she received two calls from "9-0-1 numbers." During the first call, the caller asked if Williams knew "A. D." She said the caller told her that A.D. "didn't do it and he be [sic] crying and stuff like that and he don't [sic] want y'all to come to Court in May." Williams knew the caller was talking about the appellant. During the second call, the caller again said he was calling for A.D. The caller knew Williams's name and knew her sister's first name was Erica. Williams said she had not wanted to identify the appellant on direct examination because she was scared. The State asked her if she was sure the appellant was the shooter, and she answered, "No." Upon being questioned

by the trial court, Williams said that the caller did not threaten her but that "he was telling me, basically, not to come to Court."

The State argued that the trial court should allow Williams to testify about the telephone calls because "the jury should be allowed to hear about this conversation, why she is scared today and why that identification is shaky today." The defense argued that the evidence was "more prejudicial than probative" because nothing directly linked the appellant to the calls. The trial court ruled that the calls could not be considered prior bad acts because they had not been connected to the appellant. The court noted that case law allowed testimony about a defendant's threatening a witness. However, the court determined that those cases were not on point because the appellant did not threaten the witness in this case. Nevertheless, the court ruled that the calls were highly relevant to the issue of identification "because of the obvious effect that the phone calls [have] had on the witness." The trial court also ruled that the probative value of the evidence "far" outweighed the prejudicial effect.

Williams's redirect testimony resumed. At the conclusion of her testimony, she identified the appellant as the shooter. The trial court then instructed the jury as follows:

> Ms. Williams' testimony with regard to the phone calls and the way she felt. My instructions to you are that that testimony wasn't provided to prove to you any assertion with regard to the defendant, whether or not he tried to threaten her.
> Nothing of that has been tied to him. So you are not to consider it for that purpose, at all.
>
> The reason it was allowed is to show the impact on the witness, okay. So it is really for two issues, the witness credibility, the credibility as a witness. And then, also, your consideration as far as the identification testimony is concerned.
>
> But, you are not to put any weight on it, with regard to the defendant, having made the phone calls, or anything, okay. It is only for the purpose of dealing with the witness and the value that you put on the witness testimony for identification and credibility.

On appeal, the appellant contends that the calls were inadmissible as prior bad acts pursuant to Tennessee Rule of Evidence 404(b). However, the appellant did not make that argument at trial. "Ordinarily, issues raised for the first time on appeal are waived." State

v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). In any event, the trial court ruled that Rule 404(b) was not at issue because the calls had not been connected to the appellant. See Tenn. R. Evid. 404(b)(3) (providing that proof of a defendant's other crimes, wrongs, or acts are inadmissible unless the court finds proof of the other crime, wrong, or act to be clear and convincing). The State argues that the trial court properly allowed Williams to testify about the calls and that the jury instruction was unnecessary because any attempt by a defendant to suppress a witness's testimony "is relevant as a circumstance from which guilt of the accused may be inferred." Tillery v. State, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978). However, at the time of the trial court's ruling, Dashaun Hobbs had not testified and linked the appellant to the calls. Therefore, the trial court ruled that this was an issue solely of relevance.

Generally, evidence must be relevant to some issue at trial in order to be admissible. See Tenn. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). "Under this standard, we will not reverse unless the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (internal quotations and citations omitted).

Williams had identified the appellant at a previous hearing as the shooter. However, on direct examination at trial, she said she was not sure. The trial court ruled that the telephone calls were relevant to explain Williams's fear in testifying against the appellant and why she had become unsure of his identification as the shooter since the preliminary hearing. We agree that the calls were relevant to explain Williams's fear and reluctance to identify the appellant. Regarding prejudice, the trial court reduced the prejudicial effect of Williams's testimony by specifically instructing the jury that the calls had not been linked to the appellant and that the jury could consider Williams's testimony only in determining whether the calls had impacted her identification of the appellant and her credibility. Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Given that the prejudicial value of relevant evidence must be substantially outweighed by the danger of unfair prejudice in order for the

evidence to be inadmissible, we cannot say that the trial court abused its discretion by ruling that Williams could testify about the calls. Therefore, the appellant is not entitled to relief.

## C. Sentencing

The appellant contends that his effective sentence is excessive because the trial court misapplied an enhancement factor and improperly ordered consecutive sentencing. The State argues that the trial court properly sentenced the appellant. We agree with the State.

At the appellant's sentencing hearing, the State did not call any witnesses to testify and asked that the trial court rely on the appellant's presentence report. According to the report, the then twenty-one-year-old appellant was single with a one-year-old daughter. In the report, the appellant described his mental health as "fair" and his physical health as "excellent" with no past or current use of alcohol or illegal drugs. The report shows that he was expelled from the tenth grade in 2006 and attended Job Corps in Kentucky from May to September 2007. He stated in the report that he worked for his uncle at Top Cat Masonry from the ages of sixteen to twenty. The report shows that the appellant has two prior convictions of driving on a suspended license and one conviction each of unlawful possession of a weapon, disorderly conduct, and criminal trespass. The report also shows that he violated the probation sentence he received for the unlawful possession of a weapon conviction and that he was adjudicated delinquent as a juvenile of sexual battery in 2000.

The victim of the sexual battery offense testified for the appellant that her brother was the appellant's grandfather. In 2000, the then ten-year-old appellant was living with his grandfather, who was involved in a custody battle over the appellant with the victim's mother. Someone accused the appellant of sexually assaulting the victim. The victim denied that the appellant did anything of a sexual nature to her.

The appellant chose not to make a statement on his own behalf at the sentencing hearing. However, he asserted through his attorney that he was not guilty of the crimes in this case.

The trial court noted that it had reviewed the appellant's presentence report.[3] The trial court applied enhancement factors (3), that the offense involved more than one victim, and (10), that the defendant "had no hesitation about committing a crime when the risk to human life was high." Tenn. Crim. App. § 40-35-114(3), (10). The trial court also applied enhancement factor (6), that the personal injuries inflicted upon the victim were particularly

---

[3]As noted by the appellant, the presentence report was never made an exhibit at the hearing but was included in the appellate record.

great, to the appellant's attempted voluntary manslaughter convictions. See Tenn. Crim. App. § 40-35-114(6). The trial court applied no mitigating factors. See Tenn. Crim. App. § 40-35-113.

The trial court noted that the appellant was a Range I, standard offender and that the range of punishment was two to four years for the attempted voluntary manslaughter convictions and one to two years for the reckless endangerment conviction. See Tenn. Code Ann. § 40-35-112(a)(4), (5). The trial court also noted that the minimum sentence for the employing a firearm conviction was six years. See Tenn. Code Ann. § 39-17-1324(h)(1). The trial court sentenced the appellant to four years for each attempted voluntary manslaughter conviction and two years for the reckless endangerment conviction. The trial court sentenced the appellant to six years for the employing a firearm conviction and noted that the sentence had to be served at one hundred percent and consecutively to the other sentences. See Tenn. Code Ann. § 39-17-1324(e)(1), (2). The trial court ordered that the appellant serve all of the sentences consecutively for a total effective sentence of sixteen years in confinement.

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Susan Renee Bise, ___ S.W.3d ___, No. E2011-00005-SC-R11-CD, 2012 Tenn. LEXIS 645, at *76 (Knoxville, Sept. 26, 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the

general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; Bise, ___ S.W.3d at ___ n.32, 2012 Tenn. LEXIS 645, at **42-43 n.32. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

Turning to the instant case, the appellant contends that the trial court erred by imposing a sentence in excess of the minimum prescribed sentence. Specifically, he argues that the trial court erred by applying enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high.

As to the appellant's reckless endangerment conviction, this court has held that enhancement factor (10) does not apply to a reckless endangerment conviction because the risk to human life is inherent in the offense. State v. Emory Leslie Letson, No. E2010-00055-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 673, at *16 (Knoxville, Aug. 26, 2011). In any event, we have already determined that the evidence is insufficient to support that conviction. Regarding the appellant's remaining convictions, this enhancement factor "is broadly written to include 'risk to human life.'" State v. Imfeld, 70 S.W.3d 698, 707 (Tenn. 2002). The factor "may be applicable when individuals other than the victim may have been harmed by the commission of the offense." State v. Pierre Terry, No. W2009-00169-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 991, at *13 (Jackson, Dec. 8, 2009) (citing id.). The evidence shows that the appellant was the first one out of the Crystal

Palace, turned around, and fired toward the building as people were exiting and security officers were standing at the front doors. Kevin Pilatt, who was standing beside Cedric Sawyer, testified that he found a bullet hole in his shirt. Therefore, the trial court properly applied this enhancement factor.

Regarding consecutive sentencing, the trial court stated during the sentencing hearing that "I just can't think of a worse situation. An individual hanging out [in] a parking lot of a business and firing shots at a group of people at the front door." The trial court said that it was ordering consecutive sentencing based upon the appellant's being a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(b)(4). The trial court stated that the circumstances of case were extremely aggravated, that confinement for an extended period of time was necessary to protect society, and that the aggregate length of the sentences related to the offenses.

In order to find that a defendant is a dangerous offender, a court must also find that (1) the sentences are necessary in order to protect the public from further misconduct by the defendant and that (2) the terms are reasonably related to the severity of the offenses. State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). In the instant case, the trial court properly addressed the Wilkerson factors. Accordingly, the trial court properly ordered the appellant to serve the attempted voluntary manslaughter convictions consecutively. As stated previously, the appellant was required to serve the sentence for employing a firearm during the commission of the dangerous felony consecutively. Given that the evidence is insufficient to support the appellant's conviction of reckless endangerment, that conviction is reversed and his effective sentence is fourteen years in confinement.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the evidence is sufficient to support the appellant's convictions and sentences for attempted voluntary manslaughter and employing a firearm during the commission of a dangerous felony. However, the evidence is insufficient to support his conviction of reckless endangerment. Therefore, that conviction is reversed, and his effective sentence is modified to fourteen years in confinement. The case is remanded to the trial court for correction of the judgment for employing a firearm to reflect that the appellant is to serve one hundred percent of that sentence instead of thirty percent.

_____
NORMA McGEE OGLE, JUDGE